# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

MOHAMMED "MOE" DIAB,

          Defendant.

No. 1:21-cr-10250-NMG

## MOHAMMED DIAB'S SENTENCING MEMORANDUM
## IN SUPPORT OF THE PARTIES' AGREED-ON SENTENCE

Maksim Nemtsev (Mass. Bar No. 690826)
20 Park Plaza, Suite 1000
Boston, MA  02116
Telephone: (617) 227-3700
menemtsev@gmail.com

Justin V. Shur (*pro hac vice*)
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Telephone:  (202) 556-2000
Facsimile:  (202) 556-2001
jshur@mololamken.com

Megan Cunniff Church (*pro hac vice*)
Kenneth E. Notter III (*pro hac vice*)
MOLOLAMKEN LLP
300 North LaSalle Street, Suite 5350
Chicago, IL  60654
Telephone:  (312) 450-6700
Facsimile:  (312) 450-6701
mchurch@mololamken.com
knotter@mololamken.com

*Attorneys for Mohammed Diab*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 3

I.     Moe's Personal History & Characteristics.............................................................. 3

     A.     Moe's Early Life and Immigration to the United States............................ 3

     B.     Moe's Education and Work History ......................................................... 3

     C.     Moe Is a Family Man and Valued Member of the Community.................... 5

II.     The Atypical Offense Conduct .............................................................................. 6

     A.     Moe Joins an Ongoing Scheme.................................................................. 6

     B.     The Scheme Neither Contemplates nor Inflicts Pecuniary Harm.............. 7

     C.     Moe Didn't Profit from the Scheme but Has Been Punished .................... 8

III.     The Plea Agreement & Presentence Report............................................................ 8

     A.     Moe's Flawless Record on Pretrial Release............................................... 8

     B.     The Parties Agree Time-Served with Supervised Release Is Appropriate ........... 9

     C.     The Presentence Report .............................................................................. 10

ARGUMENT ............................................................................................................... 10

I.     The Appropriate Guidelines Range in Context..................................................... 11

II.     The Court Should Accept the Parties' Agreement................................................ 13

     A.     There Are "Justifiable Reasons" for the Agreed-On Sentence.............. 13

     B.     There Is No Sound Reason to Reject the Agreement ............................. 16

III.     The Agreed-On Sentence Serves the Purposes of Sentencing.............................. 18

     A.     Moe's History and Characteristics Warrant the Agreed-On Sentence ................. 18

     B.     The Circumstances of the Offense Also Support the Agreed-On Sentence ......... 19

     C.     The Other Relevant Factors Support the Agreed-On Sentence ........................... 19

CONCLUSION............................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## CASES

*Gall v. United States*,
    552 U.S. 38 (2007) ..............................................................................................11, 17

*Hughes v. United States*,
    584 U.S. 675 (2018) ....................................................................................................13

*In re Morgan*,
    506 F.3d 705 (9th Cir. 2007) ......................................................................................16

*Nieves v. McSweeney*,
    241 F.3d 46 (1st Cir. 2001) .........................................................................................14

*Santobello v. New York*,
    404 U.S. 257 (1971) ....................................................................................................16

*Skilling v. United States*,
    561 U.S. 358 (2010) ....................................................................................................11

*United States v. Aegerion Pharms., Inc.*,
    280 F. Supp. 3d 217 (D. Mass. 2017) .........................................................................16

*United States v. Aguilar*,
    884 F. Supp. 88 (E.D.N.Y. 1995) ...............................................................................18

*United States v. Alphas*,
    785 F.3d 775 (1st Cir. 2015) ............................................................................. *passim*

*United States v. Benkahla*,
    501 F. Supp. 2d 748 (E.D. Va. 2007) ..........................................................................19

*United States v. BP Prods. N.A. Inc.*,
    610 F. Supp. 2d 655 (S.D. Tex. 2009) .........................................................................16

*United States v. Bundy*,
    359 F. Supp. 2d 535 (W.D. Va. 2005) .........................................................................16

*United States v. Cabrera*,
    567 F. Supp. 2d 271 (D. Mass. 2008) ..........................................................................18

*United States v. Edwards*,
    595 F.3d 1004 (9th Cir. 2010) .....................................................................................20

*United States v. Eggleston*,
    347 F. Supp. 3d 381 (E.D. Wis. 2018) ........................................................................14

*United States v. Escobar Noble,*
    653 F.2d 34 (1st Cir. 1981)..................................................................16

*United States v. Garcia,*
    No. 06-cr-169, 2008 WL 4862453 (E.D.N.Y. Sept. 8, 2008)...................................14

*United States v. Gardellini,*
    545 F.3d 1089 (D.C. Cir. 2008)..............................................................15

*United States v. Jaber,*
    362 F. Supp. 2d 365 (D. Mass. 2005) ........................................................14

*United States v. Jordan,*
    582 F.3d 1239 (11th Cir. 2009) ............................................................20

*United States v. Kraus,*
    137 F.3d 447 (7th Cir. 1998) ..............................................................16

*United States v. Moore,*
    916 F.2d 1131 (6th Cir. 1990) .............................................................16

*United States v. Nesbeth,*
    188 F. Supp. 3d 179 (E.D.N.Y. 2016) ......................................................17

*United States v. Prosperi,*
    686 F.3d 32 (1st Cir. 2012).........................................................11, 15

*United States v. Taliaferro,*
    No. 08-cr-0007, 2009 WL 3644114 (D.N.H. Oct. 30, 2009)...................................16

*United States v. Vanderwerff,*
    788 F.3d 1266 (10th Cir. 2015) ............................................................16

*United States v. Vinas,*
    106 F.4th 147 (1st Cir. 2024)..............................................................19

*Wisconsin v. Mitchell,*
    508 U.S. 476 (1993).......................................................................19

## STATUTES & RULES

18 U.S.C. § 3551 ...............................................................................17

18 U.S.C. § 3553(a)....................................................................11, 18, 19

18 U.S.C. § 3553(a)(1) .........................................................................19

18 U.S.C. § 3553(a)(2)(A).......................................................................20

18 U.S.C. § 3553(a)(2)(B) .................................................................................................19, 20

18 U.S.C. § 3553(a)(2)(C) ......................................................................................................19

18 U.S.C. § 3553(a)(6) ...........................................................................................................19

18 U.S.C. § 3553(a)(7) ...........................................................................................................19

Fed. R. Crim. P. 11(c)(1)(C) .........................................................................................9, 16, 18

Fed. R. Crim. P. 11(f) ..............................................................................................................1

Fed. R. Evid. 410(a)(3) ............................................................................................................1

Pub. L. No. 98-473, 98 Stat. 1837 (1984)...........................................................................17, 18

## SENTENCING GUIDELINES

U.S.S.G. §2B1.1 ................................................................................................................11, 19

U.S.S.G. §2B1.1(a)(1) .............................................................................................................12

U.S.S.G. §2B1.1(a)(1)(C) .........................................................................................................12

U.S.S.G. §2B1.1(b)(10) ...........................................................................................................12

U.S.S.G. §3B1.1 ................................................................................................................10, 13

U.S.S.G. §3C1.1 ................................................................................................................10, 13

U.S.S.G. §3E1.1(a) .................................................................................................................13

U.S.S.G. §3E1.1(b) .................................................................................................................13

U.S.S.G. §4C1.1(a) ..............................................................................................................9, 13

U.S.S.G. §5C1.1 .....................................................................................................................13

U.S.S.G. Ch. 1 Pt. A ................................................................................................................13

U.S.S.G. Ch. 5 Pt. A. ...............................................................................................................13

## OTHER AUTHORITIES

A. Kennedy, Speech at the Am. Bar Ass'n Ann. Meeting (Aug. 9, 2003) ...................................17

Cong. Rsch. Serv., *Lebanon: Background and U.S. Relations* (May 19, 2023),
   https://shorturl.at/01zq4 .....................................................................................................3

M. Caudy *et al.*, *Jail versus Probation: A Gender-Specific Test of Differential Effectiveness and Moderators of Sanction Effects*, 45 Crim. Just. & Behav. 949 (July 2018) ............................................................................18

Dep't of Justice, Justice Manual .................................................................................14, 16

N. Gorsuch & J. Nitze, Over Ruled (2024) ......................................................................17

U.S. Census Bureau, *E-Stats* (May 16, 2008), https://shorturl.at/60q9s .................................................................................................4

U.S. Census Bureau, *Quarterly Retail E-Commerce Sales* (Mar. 13, 2019), https://shorturl.at/ukVJo ..........................................................................................4

U.S. Sentencing Comm'n, *Statistical Information Packet for Fiscal Year 2023*, https://shorturl.at/eZyRY .........................................................................................15

## INTRODUCTION

Mohammed "Moe" Diab made a terrible decision.[1]  He agreed to participate in a scheme to fraudulently induce a financial institution to settle debit and credit card transactions.  For doing so, he has pleaded guilty to conspiring to commit bank fraud, and he accepts full responsibility.  He profoundly regrets his conduct and apologizes to everyone he deceived, everyone he let down, and everyone who has been directly or indirectly affected.

But Moe is more than that bad decision.  He came to the United States as a child, fleeing war-torn Lebanon with his family for the promise of a better life in America.  He then graduated from high school in California, became a U.S. citizen, and started a series of small businesses.  But above all, Moe is defined by his love for his family.  With his wife, Lucy, he has three beautiful children, ages eight, seven, and six months.  He spends every possible moment with his family.  He is a force for good in the lives of those around him, as the letters submitted to the Court attest.

And Moe's conduct, though serious, is atypical for a fraud case.  Fraud intends to inflict pecuniary harm on a victim for the defendant's personal benefit.  None of the above is true here.  Moe neither intended nor inflicted any pecuniary harm, and he didn't profit.  In fact, the scheme put money into the deceived party's pocket, but not Moe's.  That does not excuse his conduct, but it does separate Moe from the defendants the Guidelines were designed for.

The government, to its credit, recognizes the atypical circumstances here and agrees that a sentence of time-served, supervised release, and a fine is appropriate.  The parties have litigated this case intensely.  Each side was preparing for a hard-fought multi-week trial featuring witnesses from across the country and knotty legal issues that threatened to consume immense public and

---

[1] All statements in this memorandum and at the upcoming sentencing hearing are made in a proceeding "under Federal Rule of Criminal Procedure 11."  Fed. R. Evid. 410(a)(3); *see* Fed. R. Crim. P. 11(f) (statements relating to pleas governed by Fed. R. Evid. 410).

private resources and tie up the courts for years to come.  But for what?  Moe is a non-violent, zero-point offender unlikely to reoffend.  Most defendants convicted of fraud-related offenses in this Circuit receive a non-custodial sentence or a downward departure or variance.  And Moe's conduct lacks the worst features of traditional fraud.  On these unusual facts and after extensive negotiations, the parties reached an agreement to end this long-running case on terms that both sides agree serve the purposes of sentencing, reflect the atypical circumstances, and avoid further costly and protracted proceedings.  That is how the system is supposed to work.

The agreed-on resolution is particularly appropriate given that Moe has already felt, and will continue to feel, the consequences of his conduct.  After cooperating with an FTC investigation, Moe agreed to a $1 million personal judgment and a permanent injunction preventing him from working in the payment processing industry.  He has spent more than three years with his liberty curtailed on pretrial release and with his wife and children under constant stress.  By pleading guilty to a felony, he will suffer lifelong consequences, losing constitutional rights of special importance to an immigrant like him.  And worse than anything, he must live with the knowledge that his conduct forced his family to experience the stress and shame of having a husband and father charged with and now convicted of a federal crime.  Moe will never forgive himself for that.

For these reasons and more, we ask the Court to accept the parties' agreement and impose the agreed-on sentence.  There are ample "justifiable reasons" for that sentence and none to reject it.  And even apart from the parties' agreement, a sentence of time-served, supervised release, and a fine best serves the interests of society and the purposes of sentencing.

## BACKGROUND

I.  **MOE'S PERSONAL HISTORY & CHARACTERISTICS**

A.  **Moe's Early Life and Immigration to the United States**

Moe was born in Beirut, Lebanon, in 1975 at the onset of the Lebanese Civil War, which claimed 150,000 lives.  *See* Cong. Rsch. Serv., *Lebanon: Background and U.S. Relations* (May 19, 2023), https://shorturl.at/01zq4.  Moe and his siblings grew up in a war zone.  PSR ¶ 57.  Their apartment building was pockmarked with bullet holes and rocket blasts.  *Id.*  Weeks would pass with near-constant bombings that forced the family to hide in a cramped basement with hundreds of other civilians sharing one bathroom, little food, and no beds.  *Id.*

But Moe's parents were determined to give their children a better life in the United States.  His mother, Hayat, never learned to read or write, and his father, Samih, grew up as an orphan selling candy on the streets of Beirut.  Yet when Moe was five years old, his mother managed to obtain lawful permanent residency in the United States.  PSR ¶ 57.  For a time, Moe and his mother lived in Chicago apart from the rest of the family.  They later returned to Lebanon before moving permanently to California in 1987 once the entire family had obtained lawful residence.  *Id.*

From day one, Moe was enamored with life in the United States.  He quickly learned English, made friends, and thought of California as home.  *See* PSR ¶¶ 57-58.  After graduating from high school in 1994, Moe proudly became a U.S. citizen.  *Id.* ¶¶ 57, 69.  He has lived in California ever since, and apart from the conduct at issue, he has largely lived the American dream—fleeing unspeakable conditions to build a happy and productive life in America.

B.  **Moe's Education and Work History**

The sacrifices Moe's parents made for their children paid off.  Despite fleeing war-torn Lebanon for a country where he didn't speak the language, with a mother who couldn't read or write at all, Moe was able to graduate high school in California.  *See* PSR ¶ 69.  Though Moe's

3

education ended there, he taught himself how to repair bikes and cars, obtained a real estate license, and started a series of small businesses over the years. *See id.* ¶¶ 69-77.

Unsurprisingly, Moe's family valued hard work more than most, and Moe is living proof. Moe has worked ever since he was a teenager. His first job was at a discount clothing store where he picked up shifts after school and on the weekends. After high school, he ran a bike repair business out of his garage. Since then, he has worked in car sales, real estate, carpet cleaning, and more. PSR ¶¶ 70-77. In recent years, Moe and his wife have run a towing business with nine trucks and nine subcontracted employees. *Id.* ¶ 72. That business (and others before it) proved successful enough for Moe and his family to live comfortably, though most of Moe's current net worth is attributable to the dramatic increase in the value of the family home. *See id.* ¶¶ 79-81.

Growing up, Moe greatly admired his older cousin Andy Khawaja. To escape an abusive father, Andy had moved in with Moe's family back in Lebanon. Andy was, even then, viewed as the star of the family, and Moe's time living with his older, charming cousin in the extreme circumstances of civil war left a lasting impression on him. He looked up to Andy. But more than that, he came to trust Andy completely and, often, unquestioningly. That bond endured even as Andy left Lebanon to live in Europe before reuniting with Moe's family in California.

In 2006, Andy founded a company called Allied Wallet. Allied Wallet helped online merchants to accept debit and credit card payments from customers. PSR ¶ 10. Andy had impeccable timing. In 2005, revenue from e-commerce in the United States amounted to less than $90 billion. U.S. Census Bureau, *E-Stats* (May 16, 2008), https://shorturl.at/60q9s. By 2018, e-commerce revenue topped $500 billion per year. U.S. Census Bureau, *Quarterly Retail E-Commerce Sales* (Mar. 13, 2019), https://shorturl.at/ukVJo. As Allied Wallet's CEO and sole owner, Andy became fabulously wealthy. PSR ¶ 9.

For five years, Allied Wallet grew without any involvement by Moe.  Despite his bond with Andy, there was little Moe could contribute to the business.  He had never taken business or finance classes.  He had no experience in payment processing or with the technology that the payment system relied on.  He was primarily a self-taught mechanic who was running a carpet cleaning company at the time.  PSR ¶¶ 70, 76.

Nevertheless, in 2011, Moe was given the title of Allied Wallet's Chief Operating Officer.  PSR ¶ 75.  That title was largely symbolic.  Moe performed the duties assigned to him and did his best to do his job well.  But he was not running the company as an ordinary COO would, and he was paid about $55,000 a year, consistent with the duties he in fact performed.  *Id.*  In practice, veteran industry professionals were running Allied Wallet.  They had degrees, decades of experience, and past employers like Visa and Mastercard, not "Moe's Carpeting & Cleaning."  *Id.* ¶ 76.

### C.    Moe Is a Family Man and Valued Member of the Community

Moe has always been defined by his love for his family.  Even as a child, Moe was uncommonly devoted to his siblings, many cousins, and other family members.  As his siblings recounted, though Moe "is the youngest of nine siblings," he plays "the pivotal role" within the family as "the one [they] all turn to in times of need, the one who sets aside his own concerns to ensure the well-being of his family."  Ex. D at 1.[2]  Though his parents have passed, Moe remains close with his siblings, five of whom live nearby in California.  *See* PSR ¶ 57.

Moe met his wife, Lucy, at a friend's birthday party.  She was working as a secretary at the time and would later become a paralegal.  She and Moe started dating shortly after meeting, and they married in 2015.  PSR ¶ 61.  They have two daughters (ages eight and seven), and in June

---

[2] Many of Moe's family members (including his siblings) speak little or no English and, for that reason, were unable to submit letters on his behalf as they otherwise would have.  Moe's siblings, for example, dictated a joint letter drafted in English by another family member.  *See* Ex. D.

they welcomed a beautiful baby boy. *Id.* Moe's daughters "adore their father, and the connection they share with him is incomparable." Ex. B at 2.

Moe spends every possible moment with his family. He drives his daughters to school every morning and picks them up every afternoon. He takes them to music lessons every Wednesday and to gymnastics every Saturday. "He is there for them at all times, helping with bedtime routines, providing cuddles, and being their pillar of strength." Ex. B at 2. With his extended family and in-laws, Moe has put together "hundreds of family events." Ex. C at 1.

From his children to his in-laws, Moe's family "depend[s] on Moe to be there for [them] at times of need with compassion and kindness," and he always is, "without hesitation." Ex. C at 1-2. The examples are endless. Moe's nephew describes how Moe inspired him to become a doctor, modeled "compassion and willingness to help others," and put "a roof over [his] head" when he had nowhere to live. Ex. E at 1. Moe's sister- and brother-in-law tell about how Moe dropped everything to take their son to urgent care after he'd been hurt by a bully. Ex. C at 1-2.

Moe also gives back to his community. Without being asked, Moe and his wife have repeatedly driven around Los Angeles delivering food and blankets to "approximately 100 homeless individuals." Ex. B at 1. Moe has also donated clothes and supplies to families displaced by war. *See* Ex. C at 2. As others have put it, "Moe is a dedicated and compassionate person who genuinely cares about the well-being of others." *Id.* He embodies "the values of kindness, responsibility, and generosity." Ex. D at 1. And his presence enriches the lives of those around him "in ways that words cannot fully capture." Ex. B at 1.

## II.    THE ATYPICAL OFFENSE CONDUCT

### A.    Moe Joins an Ongoing Scheme

When Moe joined Allied Wallet in mid-2011, he knew nothing about payment processing, the financial system, or compliance. What little training Moe received on those subjects came

from others at Allied Wallet. And by 2011, the company had already begun a scheme to disguise certain merchants to evade rules set by Visa and Mastercard. So when Moe joined the company, the scheme was presented to him as an accepted practice that Allied Wallet did as a favor to friends of Andy's. Moe blindly trusted that his cousin would never involve him in illegal conduct. He should have known better, he should have refused to go along with it, he should have spoken up. But he didn't. Instead, he rationalized his conduct and the lies as an accepted part of the payment processing business that everyone in the industry knew about but conveniently ignored.

Moe's involvement in the scheme was also a relatively small aspect of his work. Allied Wallet had thousands of merchants. But Moe helped disguise a handful of merchants to deceive Allied Wallet's counterparties. (Those merchants accounted for the "more than 100 sham merchant accounts" in the scheme. PSR ¶26.) Most of Moe's work thus involved legitimate merchants who truthfully obtained payment processing services. Most days, he could pretend the scheme didn't exist and go about his work and his life. That does not excuse what Moe did, but it helps explain how a good man could rationalize such bad decisions.

### B.    The Scheme Neither Contemplates nor Inflicts Pecuniary Harm

Justifying the conduct was made easier because, as the government admits, the scheme neither contemplated nor inflicted any pecuniary harm on the deceived entities. When a transaction is processed, the merchant pays the card brand (*e.g.*, Visa), issuer, and acquirer a fee for their services. Those entities keep that fee no matter what, even if the transaction is refunded (a "chargeback"). In fact, those entities collect an extra fee for chargebacks.

So when Moe and others tricked issuers and acquirers into processing transactions, those entities made an "actual profit" by collecting fees on every transaction. Dkt. 243 at 1. The whole point was to get transactions processed for merchants the issuers and acquirers would have turned away (collecting no fee) had they known the truth. Thus, the scheme—by design and operation—

put money into the deceived entities' pockets.  Moe knew this.  Yes, he was lying, but his lies would leave the issuers and acquirers with more money than they started with, which, he told himself, was all they cared about anyway.  Again, that doesn't make it right, but it does make it an unusual species of fraud that an otherwise good person is more likely to go along with.

### C.    Moe Didn't Profit from the Scheme but Has Been Punished

Unlike the entities he deceived and others involved in the scheme, Moe did not profit from the scheme.  Tom Wells, for example, received a percentage of every transaction processed for a merchant he brought to Allied Wallet.  So did Rudy Dekermenjian.  But not Moe.  He was not paid a percentage of any transaction or a commission or bonus if he helped merchants process more transactions.  He participated in the scheme not for his own benefit or out of greed, but because he lacked the courage to say no to the cousin he had always admired and trusted.

Though Moe did not profit from the scheme, he has paid for it.  In 2019, he personally agreed to a $1 million judgment with the FTC for the conduct at issue here.  Stipulated Final Order, *Fed. Trade Comm'n v. AlliedWallet, Inc.*, No. 2:19-cv-4355 (C.D. Cal.), Dkt. 10-1 (filed May 20, 2019).  To pay that judgment, far more than he ever earned from Allied Wallet, Moe and his wife turned over the deed to a property that Moe had purchased and rehabilitated.  *See id.* at 8-9.  He also agreed to be forever banned from working in the payment processing industry or engaging in any other deceptive conduct.  *Id.* at 7.

### III.    THE PLEA AGREEMENT & PRESENTENCE REPORT

### A.    Moe's Flawless Record on Pretrial Release

Moe was arrested and arraigned in 2021, serving a brief time in custody before being released on his own recognizance.  For more than three years, Moe has complied with the terms of his release.  Recognizing that Moe posed no danger to the community, the Court granted both

of Moe's requests for permission to travel abroad while on pretrial release.  *See* Dkts. 80, 81, 99, 100.  After each trip, Moe returned as promised and without incident.

Nevertheless, this case has been hard on Moe and his family.  For three years, Moe has lived with the ever-present prospect that his greatest fear—being taken from his family—is about to come true.  Even the prospect of a three-week trial thousands of miles from his family has caused a state of near-constant stress.  It is one thing for Moe to bear that burden.  He has only himself to blame.  But it is not just Moe who is affected.  For months, Moe's wife had to prepare for Moe to be gone during the last month of her high-risk pregnancy or shortly after she gave birth, leaving her to care for their two daughters and a newborn.  And his children have spent the last three years fearing that they are about to lose their father.  The true cost of that emotional burden is unknowable.  But as Moe's wife described, the "thought of our family falling apart without [Moe] is unbearable, and it would leave a lasting scar on our hearts."  Ex. B at 2.

## B.    The Parties Agree Time-Served with Supervised Release Is Appropriate

After litigating this case intensely for years, the parties reached an agreement to resolve the case under Rule 11(c)(1)(C).  That agreement was independently approved by leadership in (1) the U.S. Attorney's Office, (2) the Fraud Section of Main Justice, and (3) the Money Laundering & Asset Recovery Section of Main Justice.  *See* Dkt. 224 at 5-6.  Under the agreement, Moe would plead guilty to conspiracy to commit bank fraud and stipulate to a total offense level of fourteen, including an enhancement that prevented Moe from receiving the two-point reduction that he otherwise would have received for his status as a zero-point offender.  *Id.* at 2; *see* U.S.S.G. § 4C1.1(a) (all citations to 2024 ed.).  A blind application of the stipulated offense level would

translate to an advisory Guidelines range of fifteen to twenty-one months.[3] But that advisory range is artificially high given the unique facts here. The parties' stipulated below-Guidelines sentence thus corrects that distortion so that the sentence—as it must—fits the circumstances.

### C.    The Presentence Report

Much of the Presentence Report reflects who Moe is as a person. It describes how he escaped war-torn Lebanon as a child and built a better life in America. PSR ¶¶ 57-59. It highlights one of a thousand examples of how Moe is a positive force in the lives of those around him, noting how Moe inspired and encouraged his nephew to become a doctor. *Id.* ¶ 60. And it describes the robust family support that will ensure that Moe learns from his conduct and does not reoffend. *Id.* ¶¶ 60-61. But no report can capture what Moe means to his family and others.

## ARGUMENT

The Court should accept Moe's plea and impose the agreed-on sentence of time-served, supervised release, and a fine. Ample "justifiable reasons" support that sentence. Though below the Guidelines range, the agreed-on sentence reflects that the stipulated offense level fails to account for the unique facts here. Accounting for those facts, as the parties' agreement does, would yield a far lower offense level and a Guidelines range of zero-to-six months. But even on the inflated offense level, the stipulated sentence involves only a modest variance in line with sentences received by more culpable defendants. And even putting aside the parties' agreement, it is undisputed that the agreed-on sentence is "sufficient, but not greater than necessary," to satisfy

---

[3] The plea includes stipulations to a manager-supervisor enhancement under § 3B1.1 and an obstruction enhancement under § 3C1.1. Each rests on expected testimony from trial witnesses. Though we do not dispute that, if believed, the testimony could establish the basis for the enhancements by a preponderance of evidence, the testimony would not withstand cross-examination. But because the parties' agreement calls for a time-served sentence, we do not object to those enhancements for purposes of the plea, saving the government and the Court substantial time and effort, as well as allowing the government to avoid exposing witnesses who may testify against a remaining defendant to cross-examination.

the sentencing factors.  18 U.S.C. § 3553(a).  Any other sentence would be divorced from the facts and undermine the interests of society and the purposes of sentencing.

## I.     THE APPROPRIATE GUIDELINES RANGE IN CONTEXT

There is a reason courts "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 49-50 (2007).  Because sometimes it isn't.  This is one of those times.  Though "accurately calculated," the offense level stipulated in the agreement is artificially inflated in three ways.  *See United States v. Prosperi*, 686 F.3d 32, 34, 41 (1st Cir. 2012) (affirming drastically below-Guidelines sentence where offense level was inflated).

*First*, the Guidelines do not contemplate the atypical scheme here.  They were designed for classic fraud—where "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other."  *Skilling v. United States*, 561 U.S. 358, 400 (2010).  As a result, the Guidelines assume all fraud will involve at least *some* loss and thus treat the "amount of loss" as "the primary metric" for assessing "the seriousness of the offense and the defendant's relative culpability."  *United States v. Alphas*, 785 F.3d 775, 782 (1st Cir. 2015).  That is why they have categories of loss amounts with two points added for each rung up the ladder a defendant climbs.  But they have no category for a scheme that neither contemplates nor inflicts any loss at all—let alone one that puts money into the deceived party's, but not the defendant's, pocket.

An unthinking application of the Guidelines would thus treat a defendant who dupes a grandmother out of her $1,500 Social Security check the same as a defendant who tricks a bank into making millions of dollars in profit but gains nothing himself.  That makes no sense.  If fraud sentences are meant to reflect "the nature and magnitude of the loss," a scheme that neither contemplates nor inflicts any loss but forces a profit onto the deceived party demands a sentence to reflect that.  U.S.S.G. § 2B1.1 Background.  On the facts here, crediting Moe with at least a two-point reduction (equal to a one-rung reduction on the loss table) would vindicate the "purpose of

the sentencing guidelines," even though "the language of the particular policies at issue" omits that reduction.  *Alphas*, 785 F.3d at 782 n.3.

*Second*, the lack of loss transforms the sophisticated-means enhancement from a two-point penalty to a ***five-point*** hit.  That enhancement calls for a two-point increase unless the resulting offense level is less than twelve, in which case it jumps to twelve.  U.S.S.G. § 2B1.1(b)(10).  In virtually all fraud cases, the offense level before reaching that enhancement is at least ten, meaning the enhancement is only a two-level increase.  *See id.* § 2B1.1(a)(1)(C) (4-point increase for any loss above $15k).  But where there is no loss, the offense level will be just seven, making the sophisticated-means enhancement worth five points.  *Id.* § 2B1.1(b)(10).  Rigidly applying the Guidelines would treat a defendant who inflicts a $15,000 loss and uses sophisticated means the same as one who neither intends nor inflicts any loss.  That cannot be right.  A thoughtful consideration of the Guidelines would shave the extra three points off Moe's offense level.

*Third*, the stipulated offense level denies Moe the two-point reduction he would otherwise have received as a zero-point offender.  By the letter of the policy and if expected trial witness testimony is credited, Moe technically qualifies for a manager-supervisor enhancement, which disqualifies him from receiving credit as a zero-point offender.  That is why he does not object to the stipulated three-point enhancement.  But his job title and role in directing others do not merit the effective ***five-point*** enhancement that he receives by also losing the two-point reduction for being a zero-point offender.  Once again, applying the spirit of the Guidelines would credit Moe with the zero-point offender reduction.

A pragmatic, common-sense approach to the Guidelines would yield a calculation like this:

| | |
|---|---|
| Base offense level (§ 2B1.1(a)(1)): | 7 |
| No loss to deceived party, no gain to defendant: | -2 (5) |
| Sophisticated means (§ 2B1.1(b)(10)): | +2 (7) |

| | |
|---|---|
| Supervisor-manager (§ 3B1.1): | +3 (10) |
| Obstruction of justice (§ 3C1.1): | +2 (12) |
| Acceptance of responsibility (§ 3E1.1(a), (b)): | -3 (9) |
| Zero-point offender (§ 4C1.1): | -2 (7) |

The advisory Guidelines range would thus be zero to six months.  U.S.S.G. Ch. 5 Pt. A.  And because Moe's "applicable guideline range [would be] in Zone A or B," the Guidelines would consider "a sentence other than a sentence of imprisonment" to be "generally appropriate."  *Id.* § 5C1.1 note 10(A).

## II.    THE COURT SHOULD ACCEPT THE PARTIES' AGREEMENT

To accept Moe's plea, the Court need only find that "justifiable reasons" support the stipulated below-Guidelines sentence.  *Hughes v. United States*, 584 U.S. 675, 682 (2018).  Justifiable reasons unquestionably exist here.  As noted, the stipulated offense level does not reflect the atypical facts, which, once accounted for, would yield a Guidelines range of zero-to-six months.  That alone justifies the stipulated sentence, but there are even more reasons.  By contrast, there is no "sound reason" for rejecting the parties' agreement; doing so would disserve the interests of society.  The Court should accept the plea.

### A.    There Are "Justifiable Reasons" for the Agreed-On Sentence

No fewer than five reasons justify the agreed-on sentence.  *First*, as explained, the stipulated offense level does not reflect the unusual facts.  *See* pp. 11-12, *supra*.  Once the distortions are corrected, the parties' agreed-on sentence would be squarely **within** the Guidelines range and considered "generally appropriate."  That alone justifies the agreement.

*Second*, even taking the stipulated offense level at face value, this is an "atypical" case far from the "heartland" fraud the Guidelines contemplate, making a departure appropriate.  U.S.S.G. Ch. 1 Pt. A cmt. 4(b).  Fraud contemplates inflicting pecuniary harm on the victim for the

defendant's gain.[4]  And the "amount of loss" is "the primary metric" for assessing culpability for fraud.  *Alphas*, 785 F.3d at 782.  Yet it is undisputed that the scheme here not only did not contemplate (let alone inflict) pecuniary harm, but in fact contemplated pecuniary **gain** to the deceived entity but not Moe.  That is so far from the heartland of fraud in the most important way that it warrants the stipulated below-Guidelines sentence.  *Cf. United States v. Jaber*, 362 F. Supp. 2d 365, 382 (D. Mass. 2005) (probation where defendant didn't "profit"); *United States v. Eggleston*, 347 F. Supp. 3d 381, 384 (E.D. Wis. 2018) (same); *United States v. Garcia*, No. 06-cr-169, 2008 WL 4862453, at *1-2 (E.D.N.Y. Sept. 8, 2008) (same).

*Third*, Moe has already been punished.  He has personally paid a $1 million judgment to the FTC for the same conduct and agreed to cooperate with the FTC.  *See* p. 8, *supra*.  Moe paid that judgment with proceeds from a property that he "flipped" (*i.e.*, bought cheaply, improved, and resold).  Doing so strained the family finances, but he accepted the punishment and tried to learn from his bad decisions.  That civil judgment is relevant in determining an appropriate resolution to criminal conduct.  *See* Dep't of Justice, Justice Manual § 9-27.250 (civil remedies relevant).

Moe and his family have also suffered in other ways.  Even defendants "released on their own recognizance" suffer "the stress and anxiety of knowing not only that serious criminal charges were pending against them, but also that their reputations had been sullied." *Nieves v. McSweeney*, 241 F.3d 46, 54-55 (1st Cir. 2001).  If it were only Moe who had to endure that burden, that would be one thing.  But it isn't.  For her entire high-risk pregnancy, Moe's wife had to worry that Moe would not be able to be there to help her through that difficult time.  For three formative years of their lives, Moe's daughters have lived in fear that they were about to lose their father.  That harm

---

[4] The Supreme Court is considering whether a scheme **must** contemplate pecuniary harm to be punishable as fraud at all.  *See Kousisis v. United States*, No. 23-909 (U.S.).

to family is not unique to Moe, but together with the $1 million judgment, the fact that Moe has already suffered for his conduct is a recognized basis for a below-Guidelines, non-custodial sentence. *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (Kavanaugh, J.) (affirming below-Guidelines, non-custodial sentence where defendant "already suffered").

*Fourth*, the agreed-on sentence is in line with sentences for more egregious conduct. Nearly 80% of eligible defendants convicted in the First Circuit of fraud-related offenses receive non-custodial sentences, and nearly half of all fraud defendants in the First Circuit receive a downward departure or variance. U.S. Sentencing Comm'n, *Statistical Information Packet for Fiscal Year 2023*, Tables 6 & 10, https://shorturl.at/eZyRY. A few examples:

- The leader of a scheme that inflicted a $5.2 million loss received no prison time despite an 87-to-108-month Guidelines range. *Prosperi*, 686 F.3d at 34 (affirming sentence).
- The court accepted Rule 11(c)(1)(C) plea of two years' probation on two counts of mail fraud for a defendant with four criminal history points and a Guidelines range of forty-one-to-fifty-one months. Judgment, *United States v. Smith*, No. 1:17-cr-10386 (D. Mass.), Dkt. 27 (Mar. 27, 2018).
- A former police officer got probation after pleading guilty to fraud conspiracy and federal programs fraud despite a Guidelines range of eighteen-to-twenty-four months and a $200,000 actual loss. Judgment, *United States v. Nee*, No. 1:21-cr-10177 (D. Mass.), Dkt. 95 (June 17, 2024).

The chart attached to this memorandum compiles more than fifty recent cases where courts in this District gave defendants convicted of fraud-related offenses a below-Guidelines, non-custodial sentence and still more cases outside the District, including cases where defendants received time-served sentences for payment processing schemes despite higher Guidelines ranges. *See* Ex. A.

*Fifth*, the agreement confers substantial benefits to the government. There is a reason that leadership in (1) the U.S. Attorney's Office, (2) the Fraud Section of Main Justice, and (3) the Money Laundering & Asset Recovery Section of Main Justice each independently approved this plea agreement. Dkt. 224 at 5-6. In fact, there are many. The parties' agreement saves the government "the expense of trial and appeal," mitigates the "legal and evidentiary problems" the

government might face at trial or on appeal, spares government witnesses (including a confidential informant) from "serious embarrassment," and increases the chances of a "prompt disposition" of the pending case against a remaining defendant. Justice Manual, *supra*, at §9-27.420 (listing considerations); *see United States v. Escobar Noble*, 653 F.2d 34, 37 (1st Cir. 1981) (economy and risk to government can justify plea). And because the offers to Ms. Rountree and Moe were conditioned on each defendant accepting, Moe's plea helped resolve cases against two defendants. It is a minor miracle that three units within the Department of Justice could agree on anything— let alone on a below-Guidelines stipulated sentence. That they did so is proof that justifiable reasons support the agreement. *See United States v. Bundy*, 359 F. Supp. 2d 535, 538-39 (W.D. Va. 2005) (accepting agreement given judge's "experience with the prosecutor convince[d] [him] that this decision is not lightly made").

### B.     There Is No Sound Reason to Reject the Agreement

Rejecting a Rule 11(c)(1)(C) plea requires a "sound" reason for doing so and an explanation articulating that reason. *See Santobello v. New York*, 404 U.S. 257, 262 (1971).[5] And given the virtues of the adversarial process, rejecting a Rule 11(c)(1)(C) plea is "not a routine event." *United States v. Taliaferro*, No. 08-cr-0007, 2009 WL 3644114, at *2 (D.N.H. Oct. 30, 2009); *see United States v. BP Prods. N.A. Inc.*, 610 F. Supp. 2d 655, 728 (S.D. Tex. 2009) (accepting Rule 11(c) plea over victim objections where conduct killed 15 people).[6]

---

[5] *United States v. Vanderwerff*, 788 F.3d 1266, 1272 (10th Cir. 2015) (rejection reversible error); *In re Morgan*, 506 F.3d 705, 712 (9th Cir. 2007); *United States v. Kraus*, 137 F.3d 447, 453 (7th Cir. 1998) (same); *United States v. Moore*, 916 F.2d 1131, 1135-36 (6th Cir. 1990) (same).

[6] Indeed, such pleas are themselves uncommon because the government typically has no incentive to agree to them. In one judge's "experience, individuals are afforded 'C' pleas only when the government's case is weak and it is trying to lock in the plea." *United States v. Aegerion Pharms., Inc.*, 280 F. Supp. 3d 217, 226 (D. Mass. 2017).

There is no reason, sound or otherwise, to reject the agreement here.  That agreement ensures that "prison resources" are—as Congress intended—"reserved for those violent and serious criminal offenders who pose the most dangerous threat to society."  Pub. L. No. 98-473, § 239, 98 Stat. 1837, 2039 (1984) (note to 18 U.S.C. § 3551).  That isn't Moe.  He is a zero-point offender with no history of violence.  He poses no threat to society.  Outside his conduct here, Moe has been a force for good in his family and in his community.  *See* pp. 3-6, *supra*.  And because the "amount of loss" is the "primary metric" for assessing "relative culpability" of fraud defendants, no scheme could present a more compelling case for a non-custodial sentence.  *Alphas*, 785 F.3d at 782.  Indeed, it would create an unjustifiable disparity given that defendants who inflict serious actual loss routinely receive no-prison sentences.  *See* Ex. A.

Nor is the stipulated sentence "too lenient."  Yes, Moe served only one day in custody.  But as Justice Kennedy observed, "One day in prison is longer than almost any day you and I have had to endure."  A. Kennedy, Speech at the Am. Bar Ass'n Ann. Meeting (Aug. 9, 2003).  And supervised release is not granted "out of a spirit of leniency" or to "let[ ] an offender off easily." *Gall*, 552 U.S. at 48 n.4 (probation over 30-to-37-month Guidelines range).  It will subject Moe to "conditions that substantially restrict [his] liberty."  *Id.* at 48.  The guilty plea will also expose Moe to "nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons."  *United States v. Nesbeth*, 188 F. Supp. 3d 179, 184 (E.D.N.Y. 2016).  As Justice Gorsuch wrote, felons "confront collateral consequences that haunt them for years—including the loss of voting rights, licenses, public benefits, jobs, and access to housing." N. Gorsuch & J. Nitze, Over Ruled 110 (2024).  Together with the $1 million judgment and emotional toll on his family, a sentence of time-severed, supervision, and a fine is appropriate.

Rejecting the agreement, by contrast, would harm the public interest.  *See United States v. Aguilar*, 884 F. Supp. 88, 91-92 (E.D.N.Y. 1995) (noting public interest in Rule 11(c) pleas).  The parties have agreed to end a hard-fought case on just terms without imposing the cost of a lengthy trial and, potentially, many years of appellate proceedings.  Even if a prison term were obtained, that would cost the public another $4,147 per month.  PSR ¶95.  And for what?  Zero-point offenders are "less likely to recidivate than all other offenders."  *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008).  Fraud defendants, defendants over fifty when they complete their sentences (as Moe will be), and defendants who accept responsibility are particularly unlikely to reoffend.  *See* U.S. Sentencing Comm'n, *Recidivism of Federal Offenders Released in 2010* (Sept. 2021).  One study even found that imposing a prison sentence rather than a non-custodial sentence **increased** recidivism.  M. Caudy et al., *Jail versus Probation: A Gender-Specific Test of Differential Effectiveness and Moderators of Sanction Effects*, 45 Crim. Just. & Behav. 949 (July 2018).  And imprisoning Moe would have disastrous, lifelong consequences for his children.  *See* Dkt. 246 at 10-11 (collecting research).  Accepting the agreement would serve "the interests of society as a whole"; rejecting it would do the opposite.  Pub. L. No. 98-473, § 239.

## III.    THE AGREED-ON SENTENCE SERVES THE PURPOSES OF SENTENCING

Even forgetting the parties' agreement, the sentencing factors overwhelming show why a time-served sentence with supervised release and a fine is the only one that is "sufficient, but not greater than necessary," to achieve the goals of sentencing.  18 U.S.C. § 3553(a).

### A.    Moe's History and Characteristics Warrant the Agreed-On Sentence

Moe is a fundamentally good person who made a bad decision.  He is an immigrant who escaped the chaos of civil war as a child to build a happy and productive life in America.  He is devoted to his family and serves his community through charity.  His children, wife, and others depend on him to be there for them with "compassion and kindness," and he always is—"without

hesitation." Ex. C at 1-2.  He also has an unusually strong support system committed to ensuring he learns from his bad decisions.  Moe's "history and characteristics"—particularly his "strong, positive relationships with friends, family, and the community"—thus support "a sentence outside the guideline range." *United States v. Benkahla*, 501 F. Supp. 2d 748, 760-61 (E.D. Va. 2007).

**B.    The Circumstances of the Offense Also Support the Agreed-On Sentence**

Moe recognizes the seriousness of his conduct, but he asks that the Court consider how the "nature and circumstances" of his conduct lack the worst features of traditional fraud.  18 U.S.C. § 3553(a)(1).  As explained, a "defendant's relative culpability" for fraud rises and falls with the "amount of loss." *Alphas*, 785 F.3d at 782.  But that assumes there is ***some*** "amount of loss," typically to the defendant's personal gain.  Moe, however, neither intended nor inflicted any loss, and he didn't profit.  He acted not out of malice or greed but out of cowardice, refusing to say no to his cousin. *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) (motive relevant at sentencing). As the government admits, such unusual circumstances warrant a sentence of time-served, supervision, and a fine.  Dkt. 243 at 1-2; *see United States v. Vinas*, 106 F.4th 147, 154 (1st Cir. 2024) (affirming time-served for murder-for-hire plot given "idiosyncratic circumstances").

**C.    The Other Relevant Factors Support the Agreed-On Sentence**

The remaining relevant § 3553(a) factors also weigh in favor of the agreed-on sentence. There is a unique lack of any "need to provide restitution to any victims" since there is no "victim." 18 U.S.C. § 3553(a)(7); U.S.S.G. § 2B1.1 note 1 (a "victim" must suffer loss).  Similarly, a time-served sentence is needed to avoid unwarranted "sentence disparities," 18 U.S.C. § 3553(a)(6), between Moe and defendants who get non-custodial sentences despite inflicting loss. *See* Ex. A.

Nor is there any need "to protect the public from further crimes" or specifically deter Moe. 18 U.S.C. § 3553(a)(2)(B), (C).  As a zero-point, non-violent defendant who will be over fifty when his sentence ends, he is among the least likely of all defendants to reoffend; statistically, a

19

prison term would **increase** his chances of recidivism.  *See* p. 18, *supra*.  Plus, supervision is inherently and sufficiently deterrent.  Moe will "continue to be scrutinized by the probation department" and punished severely for any infraction.  *United States v. Edwards*, 595 F.3d 1004, 1017 (9th Cir. 2010).  Beyond that, the idea of being taken from his children or forcing them to endure this ordeal ever again is unbearable.  He will never be before this Court or any other again.

A prison term is also unnecessary "to afford adequate deterrence" to the public, "reflect the seriousness of the offense," or "promote respect for the law."  18 U.S.C. § 3553(a)(2)(A), (B).  Moe's experience is a billboard for why fraud does not pay.  Even though he did not profit or intend pecuniary harm, he has paid a $1 million judgment to the FTC, spent three years on pretrial release, and subjected his family to immense strain, and he will spend another year on supervised release and pay another fine.  His "conviction, in and of itself, . . . with the attendant public humiliation . . . and the loss of earning power in the future . . . will deter similar criminal conduct" by others.  *United States v. Jordan*, 582 F.3d 1239, 1251-52 (11th Cir. 2009).  That is to say nothing of the innumerable other collateral consequences that will haunt Moe for the rest of his life.

But above all, the agreed-on sentence is a "just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  Moe conspired to commit bank fraud, but he neither intended harm nor acted out of greed.  He made a bad decision, but he has paid for that decision, and his conviction will ensure that he continues to pay for that decision for the rest of his life.  A sentence of time-served, supervision, and a fine reflects the crime Moe committed without forgetting the unique aspects of that crime or that Moe is a loving father, a devoted husband, and a force for good in the lives of those around him.  The parties' agreement is a just resolution to a unique case.  No one—not Moe, not the government, not society—will benefit from rejecting that agreement.

## CONCLUSION

The Court should honor the parties' agreement and impose the agreed-on sentence.

Dated:    December 13, 2024

Respectfully submitted,

/s/ Justin V. Shur

Maksim Nemtsev (Mass. Bar No. 690826)
20 Park Plaza, Suite 1000
Boston, MA  02116
Telephone: (617) 227-3700
menemtsev@gmail.com

Justin V. Shur (*pro hac vice*)
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
Telephone:  (202) 556-2000
Facsimile:   (202) 556-2001
jshur@mololamken.com

Megan Cunniff Church (*pro hac vice*)
Kenneth E. Notter III (*pro hac vice*)
MOLOLAMKEN LLP
300 North LaSalle Street, Suite 5350
Chicago, IL  60654
Telephone:  (312) 450-6700
Facsimile:   (312) 450-6701
mchurch@mololamken.com
knotter@mololamken.com

*Attorneys for Mohammed Diab*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on December 13, 2024, I caused the foregoing to be served on all counsel of record and unrepresented parties in this matter by filing it with the Court's CM/ECF system.

/s/ Justin V. Shur
Justin V. Shur (*pro hac vice*)